**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KIMBERLY WALLACE,<br><br>        Plaintiff,<br>v.<br><br>DENIS MCDONOUGH, Secretary, U.S.<br>Department of Veterans Affairs,<br><br>        Defendant. | Civil Action No. 22-10631-MJJ |

**PLAINTIFF KIMBERLY WALLACE'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, plaintiff Kimberly Wallace ("Wallace") submits this memorandum of law in support of her motion for partial summary judgment:

## I.  INTRODUCTION AND BRIEF PROCEDURAL OVERVIEW

This action arises from a sexual harassment complaint made by Kimberly Wallace, a federal employee at the U.S. Department of Veteran Affairs ("VA" or "the Agency").  During a seven-month period (June to December 2017), Wallace was sexually harassed by her then supervisor, John Pruyn.  Both worked for Nutrition & Food Services ("NFS").  Beginning in June 2017, Pruyn required Wallace to spend numerous hours in his small office for private meetings that had no connection to Wallace's work duties.  Pruyn questioned Wallace about her personal life and relationship.  He commented on her appearance and attractiveness.  He expressed his affection and love for Wallace.  Pruyn also engaged in an escalating pattern of unwanted hugging, kissing, and massaging Wallace.

1

All the while, Pruyn regularly advised Wallace of his plans to discipline or terminate several NFS colleagues, including Marty Morale ("Morale"), who was Wallace's then fiancée and long-term partner. Pruyn's ongoing threats that Morale could be fired made Wallace terrified to protest or complain. Wallace similarly feared for her own job if she challenged Pruyn.

Between July and September 2017, Wallace went out on medical leave for knee replacement surgery and rehabilitation. During her medical leave, Pruyn continued to harass Wallace through unwelcome and excessive phone calls and texts messages. Hoping to escape Pruyn, Wallace secured employment in a different VA department—Time and Billing. When Wallace was required to return to NFS for the month of October 2017, Pruyn's verbal and physical harassment resumed with a vengeance and continued until Wallace's final days at NFS. Even after her leaving NFS for her new position, Wallace was harassed by Pruyn through unwelcome phone calls, texts, and invitations to get together. Pruyn also engaged in unwanted physical touching of Wallace on three occasions in November 2017 when she briefly visited NFS.

On or about December 11 or 12, 2017, Wallace and Morale made an in-person complaint of harassment to the VA's EEO manager, Edwin Muller. Muller took no action to process Wallace's complaint or to advise Wallace of her legal rights. About 1.5 years later, when Morale independently filed a complaint against Pruyn, Wallace's sexual harassment claims came to light again. The VA conducted two investigations related to Morale and Wallace, and the latter investigation found that Pruyn had engaged in "aggressive sexual harassment" for which the Agency was liable. The Agency also determined that Wallace's 2019 complaint was timely due to Muller's inaction in late 2017. The Agency later conducted a damages investigation, and it awarded modest damages that Wallace rejected, leading to this civil action.

Plaintiff now seeks partial summary judgment as to liability on her sexual harassment claims. Through her deposition testimony and an affidavit, Wallace shares substantial evidence that she faced a hostile work environment at the Agency. Pruyn was deposed and broadly invoked his Fifth Amendment privilege not to testify. Wallace's claims are essentially uncontested. The VA has developed no evidence to challenge Wallace's sexual harassment allegations. Accordingly, the Agency cannot establish any genuine issues of disputed material fact that would preclude partial summary judgment on Wallace's claims.

The VA has moved for summary judgment as to the timeliness of Wallace's complaint, but this claimed defense is without merit where the Agency found that Wallace was sexually harassed and expressly determined that her Complaint was timely on account of Muller's neglect.

## I.    STATEMENT OF UNDISPUTED MATERIAL FACTS

Background Facts

Wallace is an African American woman and an honorably discharged Army veteran. Statement of Facts[1] ("SOF"), ¶ 1. Wallace became an employee of the VA in Nutrition and Food Services ("NFS") in 2011. SOF, ¶ 2. In the Summer of 2015, she was promoted to Work Lead at NFS. Id. In late 2015, Pruyn became Wallace's direct supervisor at NFS. SOF, ¶ 3.

In or about 2015, Morale was also hired by NFS, the same department where Wallace already worked. SOF, ¶ 4. At the time, Wallace was in a serious relationship with Morale, who is the father of their son. Id.

---

[1] Plaintiff's Concise Statement of Undisputed Material Facts.

Sexual Harassment Claims

In June 2017, Pruyn required Wallace to report to his office when she arrived and before she left. SOF, ¶ 5. They met for hours at a time with no work-related purpose. Id. Pruyn wanted Wallace's company for his pleasure and amusement. Id. Wallace's work colleagues, including Marlon Blackman ("Blackman"), observed that Wallace was regularly summoned to Pruyn's office for closed-door meetings. SOF, ¶ 6. Blackman noticed that their private meetings occurred early in the day, late in the day, and after Wallace's scheduled departure time of 2:30 p.m. Id. For example, Blackman saw Wallace ending her day around 3:20 p.m. after meeting with Pruyn. Id. Other supervisors at NFS noticed that Wallace was often required to be in Pruyn's office. SOF, ¶ 7. They would ask Pruyn to let Wallace work when the kitchen was short-staffed. Id.

Pruyn often discussed confidential personnel matters in front of Wallace. SOF, ¶ 8. He called Human Resources ("HR") and told Wallace to be silent. Id. He asked for HR's support to discipline or terminate employees, including Morale. Id. Pruyn later said to Wallace that he was delaying Morale's termination due to his feelings for Wallace. Id. Wallace felt intimidated by Pruyn's HR calls. Id.

During their marathon private meetings, Pruyn wanted to be physically close to Wallace. SOF, ¶ 9. Pruyn positioned his chair between Wallace and the door of his small, cramped office. Id. Wallace could not leave unless Pruyn got up to unblock the door. Id. Without Wallace's consent, Pruyn engaged in unwanted affectionate gestures and touching. SOF, ¶ 10. It started with hugs and kisses on the cheek when Wallace arrived or left his office. .Id. Pruyn was oblivious to Wallace's discomfort and pulled her closer. Id. Wallace informed Blackman that Pruyn had been kissing her. SOF, ¶ 11.

4

In early June 2017, Pruyn put his hand above Wallace's knee at a private office meeting. SOF, ¶ 12.  Wallace said she was uncomfortable, and Pruyn replied: "You don't have to be uncomfortable because I care about you."  Id.  As Pruyn said this, Pruyn started to massage Wallace's thigh.  As he kept massaging her, Wallace froze up. Id.

Beyond expressing her discomfort to Pruyn, Wallace was afraid to complain formally in June 2017 and for several months thereafter.  SOF, ¶ 13.  Wallace was afraid of Pruyn, who was known to "go after" any employees who challenged him.  Id.  She feared that she and Morale would lose their jobs.  Id.

Wallace confided to Blackman that Pruyn had touched her leg.  SOF, ¶ 14.  She was unhappy when this happened.  Id.  After this incident, Pruyn touched and massaged Wallace regularly.  SOF, ¶ 15.  He rubbed her legs, thighs and back on a daily or near daily basis.  Id.

Pruyn began to forcibly kiss Wallace's lips.  SOF, ¶ 16.  Wallace found this horribly upsetting.  Id.  Wallace estimates that forced kissing happened a couple or more times in mid to late June 2017.  Id.

Pruyn discussed personal and intimate subjects that made Wallace uncomfortable.  SOF, ¶ 17.  He said that Wallace should not be with Morale.  Id.  Pruyn said he was no longer intimate with his wife.  Id.  Pruyn asked Wallace to meet him for lunch or dinner outside of work, and Wallace declined.  Id.  Pruyn said he cared about or loved Wallace.  Id.

Pruyn regularly commented on Wallace's clothing, makeup, and appearance in or about June. SOF, ¶ 18.  He called one of her lipstick colors "very sexy." Id.  Pruyn said that Wallace had pretty eyes and asked her to remove her glasses.  Id.

In or about June 2017, there was a ceremony to award Wallace the VA Gold Coin.  SOF, ¶ 19.  During a group photo that occurred later at NFS, Pruyn changed positions to be next to Wallace.  Id.  When Wallace tried to move away, Pruyn pulled her back by grabbing her pants or

5

shirt. Id. Pruyn hugged Wallace and put his hand on her shoulder; Wallace felt humiliated. Id. Blackman observed the above photo op. SOF, ¶ 20. He saw Pruyn change positions to be near Wallace, and he saw Wallace move because she was uncomfortable. Id. Blackman also saw Pruyn put his arm around Wallace and try to hug her. Id.

On or about June 30th, 2017, Wallace took medical leave from NFS to have her knee replaced. SOF, ¶ 21. Pruyn regularly called and texted during Wallace's leave. Id. Pruyn offered to cook Wallace breakfast at her home, where Wallace lived with Morale; Wallace declined. Id.

Hoping never to return to NFS, Wallace found a new position as a Time and Leave Clerk at the VA in Brockton. SOF, ¶ 22. After Linda Chapman, an NFS manager, wrote a recommendation for Wallace, Pruyn "flipped out." Id. Wallace had to return to NFS before transferring, and she was terrified to see Pruyn or possibly lose her new opportunity if Pruyn interfered. Id.

The sexual harassment and intimidation resumed when Wallace returned to work in early October 2017. SOF, ¶ 23. Pruyn directed Wallace into his office, where he hugged and kissed her. Id. Pruyn scolded Wallace about looking for jobs and urged her to remain at NFS. Id.

Throughout October 2017, Pruyn continued to hug and kiss Wallace when she arrived or left. SOF, ¶ 24. Every day, Wallace had to sit for hours for extended personal meetings with Pruyn. Id He immediately resumed the inappropriate hugging, kissing, and touching. Id.

Pruyn continued to express his strong feelings for Wallace. SOF, ¶ 25. He wanted to see her outside of work. Id. He told Wallace that he loved her more often. Id. Pruyn said he wanted to be more than friends; Wallace declined. Id.

6

Shortly before Wallace's last day in late October 2017, Wallace was scheduled to open NFS and arrived at about 4:15 a.m.  SOF, ¶ 26.  Pruyn greeted her unexpectedly.  Id.  He said that he brought his favorite Ricotta cake for Wallace to try with him.  Id.  Pruyn implored Wallace to stay at NFS and offered to get on his knees and to oil Wallace's feet.  Id.  She said no. Id.  Pruyn hugged Wallace and forcibly kissed her lips.  Id.  Wallace told Blackman that she was shocked to see Pruyn when she thought she was alone in the building to open the kitchen around 4:00 a.m.  SOF, ¶ 27.  Blackman believed there was no business justification for Pruyn to be there.  Id.  Wallace confided to Blackman that Pruyn had begged her to stay at NFS and offered to oil her feet.  SOF, ¶ 28.  Wallace was upset and crying when she revealed this. Id.

On another day in late October 2017, Pruyn brought Wallace to his office.  SOF, ¶ 29.  After hugging and kissing Wallace, he apologized for saying and doing terrible things and crossing boundaries.  Id.  Pruyn did this to "test" Wallace and strengthen her.  Id.  Pruyn then gave Wallace a "poem" or letter titled: "To Kimmy my beautiful butterfly." Id.  Pruyn then offered to get it framed.  Id.  *See also* **Exhibit D** (copy of letter / poem).

After Morale found and photographed the poem / letter, he showed coworkers and managers at the end of October 2017. SOF, ¶ 30.  Morale showed the poem / letter to Susan Hartery, the NFS Unit Chief, and complained that Pruyn was "harassing Kim" and "trying to break up their relationship."  Id.

After Wallace left NFS for her new job at the VA, Pruyn's harassment continued at a distance.  SOF, ¶ 31.  Wallace frequently received unwanted phone calls and text messages from Pruyn.  Id.  In some texts, Pruyn asked Wallace to meet for a meal.  Wallace ignored most of the texts.  Id.

In or about November 2017, Wallace visited NFS to see Morale for lunch.  SOF, ¶ 32. Pruyn brought Wallace to his office and hugged and kissed her.  Id.  Morale discovered that Wallace was in Pruyn's locked office, and a commotion ensued.  Id.

On or about November 28, 2017, Pruyn insisted that Wallace visit his office to sign an appraisal.  SOF, ¶ 33.  Pruyn hugged and kissed Wallace.  Id.  Morale banged on the door again, and Wallace grabbed her bag and left.  Id.  Upon information and belief, Pruyn placed his cell phone in Wallace's bag, and Wallace later became fearful that Pruyn was recording her.  Id.

Wallace returned Pruyn's phone on November 29, 2017. SOF, ¶ 34.  Pruyn hugged and kissed her cheeks and then forcibly kissed her lips.  Id.  Later that day, Pruyn sent her strange text messages.  Id.

In or about early December 2017, Wallace was still getting regular phone calls and texts from Pruyn.  SOF, ¶ 35.  When a text message from Pruyn made Wallace upset at home, Morale said they had to complain.  Id.

On December 11 or 12, 2017, Wallace and Morale went to complaint to Edwin Muller, the EEO Manager for the Boston VA.  SOF, ¶ 36.  Based on Wallace's understanding of the VA's harassment prevention policy, she believed that Muller was the right person to receive her complaint. Id.   Wallace complained to Muller that her former supervisor, Pruyn, had harassed her at work, but she was too scared to complain until now.  SOF, ¶ 37.  Wallace said that the harassment did not stop when she left NFS in late October, but continued into November and December.  Id.  Wallace showed Muller a stack of recent and unwelcome text messages from Pruyn.  Id.  She also showed Muller the framed poem / letter.  Id.   Wallace told Muller that Pruyn still wanted to see her socially.  SOF, ¶ 38.  Wallace said that she was afraid and wanted Pruyn to stop.  Id.  She also told Muller she did not feel safe.  Id.  Muller knew that Wallace was

8

complaining about sexual harassment;  he agreed to follow up after his Christmas vacation.  Id. Muller never followed up in 2018.  SOF, ¶ 39.  Wallace felt betrayed and abandoned.  Id.

Upon information and belief, in or about early 2019, Morale was having further problems with Pruyn.  SOF, ¶ 40.  Morale was determined to file a complaint to expose what Pruyn had done to Wallace and to their relationship.  Id.

After these discussions, Wallace's feelings of shame, hurt, and fear came flooding back. SOF, ¶ 41.  Wallace feared that Pruyn would confront or attack her.  Id.  Wallace began to carry a pocketknife at the VA for self-protection.  Id.  In or about May 2019, Wallace felt that she was having a mental breakdown, and she was hospitalized in the psychiatric unit on the VAMC campus. SOF, ¶ 42.

In June of 2019, the VA called Wallace as a witness after Morale formally complained against Pruyn.  SOF, ¶ 43.  The focus of the VA's 2019 investigation was Morale's complaints, but the investigators also asked about Pruyn's sexual harassment of Wallace.  Id.

VA investigators urged Wallace to file a sexual harassment complaint, which she did in mid to late 2019.  SOF, ¶ 44.  As Muller had done nothing to help Wallace in 2017, VA investigators believed that her complaint was still timely.  Id.

The experience of being sexually harassed at the VA, and being ignored after speaking up, made Wallace feel violated, humiliated, and invisible.  SOF, ¶ 45.  Wallace withdrew from friends and family.  Id.  She ended her relationship with Morale in late 2019.  Id.

Between 2018 and 2021, Wallace received mental health counseling and medication at the VA's Brockton campus.  SOF, ¶ 46.  Her diagnosis is depression, anxiety, and post-traumatic stress disorder.  Id.

In early June 2021, Wallace accepted a lateral transfer to be a Time & Leave Clerk in Tennessee.  SOF, ¶ 47.  She relocated to Murfreesboro, Tennessee.  Id.

In Tennessee, Wallace found a new mental health counselor, who has treated her from 2021 to the present.  SOF, ¶ 48.  Her diagnosis remains the same—depression, anxiety, and post-traumatic stress disorder.  Id.

Federal Agency Rulings on Sexual Harassment and Complaint Timeliness

The VA issued a Final Agency Decision ("FAD") regarding Wallace's sexual harassment complaint.  SOF, ¶ 49.  The VA determined that Wallace was sexually harassed.[2]  Id.  *See also* **Exhibit E** (copy of FAD).  "The record shows overwhelming evidence that the allegations of aggressive sexual harassment occurred as alleged."  Id; **Ex. E**, p. 4.

The Agency also determined that Wallace's complaint was timely.  SOF, ¶ 50.  As noted in the FAD, Muller "fully acknowledged that Complainant contacted him in 2017 and that he discussed the matter with Complainant.  [Muller] also acknowledged that he did not open a complaint on the matter, nor did he report the matter to the appropriate management officials for intervention."  Id. (quoting **Ex E**, p. 2).  Muller also failed to notify Wallace to contact the Office of Resolution Management (ORMDI), and she did not receive this guidance until VA investigators informed her in 2019.  Id.; **Ex. E**, pp. 2-3 (*citing* ORDMI acceptance letter).

When deposed, Muller acknowledge that Wallace contacted him in December 2017, but he failed to take any further action.  SOF, ¶ 51.  Muller has no information to dispute the FAD / ORMDI finding of timeliness.  SOF, ¶ 52.  Muller authenticated the VA's Equal Employment Opportunity ("EEO") Policy.  SOF, ¶ 53.  See also **Exhibit G (**copy of EEO Policy**)**.  The

---

[2] Wallace's civil action requires a *de novo* review of her claims.  Nonetheless, the FAD findings that Pruyn sexually harassed Wallace and that Wallace's complaint was timely filed are important because the Agency has waived any timeliness defense by making these findings.  See Argument, pp. ___, infra.

agency's EEO Policy permits Wallace to bring harassment complaints to Muller as the VA's EEO Program Manager.  SOF, ¶ 54.

Muller agreed that he "dropped the ball" on Wallace's complaint.  SOF, ¶ 55 (emphasis added).  Muller is unsure, but he acknowledges that Wallace may have shown him text messages.  SOF, ¶ 56.  Muller admits that he should have  done more if Wallace shared text messages that she "perceived to be unwelcome or harassing."  Id.  Muller also believes that the poem is evidence that Pruyn subjected Wallace to  "unwelcome and unwanted behavior."  SOF, ¶ 57.  In hindsight, Muller should have "clearly taken a different path," including a direct report to Dr. Ng, the Boston VA's director.  Id.

Alleged Harasser's Refusal to Testify on Fifth Amendment Grounds

Pruyn was subpoenaed to provide deposition testimony.  Pruyn was represented by counsel.  SOF, ¶ 58.  Pruyn declined to provide any substantive testimony regarding Wallace's civil action.  SOF, ¶ 59.  He broadly invoked his Fifth Amendment privilege against self-incrimination.  Id.  Pruyn declined to answer questions about the following topics and others:

- Frequency / Duration of Private Meetings with Wallace
- Excessively Commenting on Wallace's Appearance
- Requiring Wallace to Visit Pruyn at the Start / End of Each Day)
- Greeting Wallace with Hugs and Kisses
- Forcibly Kissing Wallace
- Massaging Wallace's Leg, Thigh, and Back
- Discussing Morale and Wallace's Relationship
- Discussing a Lack of Intimacy in Pruyn's Marriage
- Professing Love, Caring and/or Romantic Interest
- Timing / Content of Phones Call and Text Messages
- Discussing Employee Discipline Issues re Morale
- Surprising Wallace at 4 a.m. with Ricotta Cake
- Offering to Get on His Knees and Oil Wallace's Feet
- Apologizing to Wallace for Improper Words and Deeds
- Pruyn's Meetings with Wallace at NFS in November 2017

11

- Continuing Efforts to See Wallace for Lunch or Dinner
- Writing Poem or Letter "To Kimmy My Beautiful Butterfly"

SOF, ¶ 60.  (SOF includes page citations to Pruyn's deposition.)

The VA has offered no evidence or information to dispute Wallace's claims of pervasive sexual harassment and a hostile work environment.  SOF, ¶ 61.

## II.    ARGUMENT

Standard of Review

A party may move for summary judgment on each claim—or "part of a claim"—for which summary judgment is sought."  Fed. R. Civ. P.56(a).  Partial summary judgment motions enable the court to narrow triable issues that can be partially resolved.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Id.  Summary judgment should enter against a defendant who "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case…" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986).

The court must draw inferences about underlying facts in the light most favorable to the nonmoving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-588, 106 S. Ct. 1348 (1986).  However, the nonmoving party may not rely on conclusory allegations and unsupported speculation to defeat summary judgment.  Pagano v. Frank, 983 F.2d 343, 347 (1st Cir. 1993).  Rather, a  party must offer "definite, competent evidence" to defeat summary judgment. Id.

12

**A.**     **Plaintiff is Entitled to Partial Summary Judgment on Her Sexual Harassment Claims Where the Alleged Harasser Has Refused to Testify and Where the Agency Has Not Developed Evidence to Counter Wallace's Claims.**

      1.     <u>Where the Accused Harasser Invoked the Fifth Amendment to Avoid Testifying, the Court Can Draw An Adverse Inference Against the Agency</u>

In civil cases, trial courts are sometimes asked to determine if a negative inference can be reasonably drawn after a witness invokes the protection of the Fifth Amendment. *See* <u>United States v. Stein</u>, 233 F.3d 6, 15 (1st Cir. 2000) ("…the Fifth Amendment does not forbid allowing adverse inferences … against parties to civil actions from their refusal to testify in response to probative evidence offered against them." (*citing* <u>Baxter v. Palmigiano</u>, 425 U.S. 308, 317 (1976). An adverse inference may also be drawn where a defendant's employee refuses to testify on Fifth Amendment grounds. "[N]othing forbids imputing to a corporation the silence of its personnel." <u>Rad Servs., Inc. v. Aetna Cas. & Sur. Co</u>., 808 F.2d 271, 275 (3rd Cir. 1986). *See also* <u>Davis v. Mut. Life Ins. Co. of New York</u>, 6 F.3d 367, 385 (6th Cir. 1993) <u>Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co</u>., 819 F.2d 1471, 1481 (8th Cir. 1987) ("[I]t was permissible to allow the invocation of the privilege to be made known to the jury when it is invoked by . . . a former employee of a company [that is] a party to the litigation").

Requests for an adverse inference are somewhat more complicated in a summary judgment context, where the court must draw all reasonable inferences in favor of the nonmoving party. Nonetheless, federal courts have held that an adverse inference is permissible to support a moving party's summary judgment motion, but only where the moving party has other evidence to make its case. *See* <u>SEC v. Colello</u>, 139 F.3d 674, 677–78 (9th Cir. 1998) (district court committed no error in drawing adverse inference against defendant's Fifth

13

Amendment invocation at summary judgment as there was additional evidence to support the SEC's case); *see also* <u>Maryland v. Universal Elections</u>, Inc., 862 F. Supp. 2d 457, 464 (D. Md. 2012) (adverse inference may corroborate other evidence that establishes the elements necessary to grant summary judgment), *aff'd* 729 F.3d 370 (4th Cir. 2013).

In the present case, Wallace has presented substantial undisputed evidence in support of her motion for partial summary judgment. As in many sexual harassment cases, plaintiff's evidence predominantly consists of Wallace's sworn testimony, which is corroborated by other credible witnesses, including her former coworker, Marlon Blackman. Based on the caselaw discussed above, as Wallace has presented solid evidence in support of summary judgment, the Court is free to consider Pruyn's refusal to testify about Wallace's claims as further support or corroboration for her summary judgment motion.

2.      <u>The Court Should Find that the Agency Has Not Offered Evidence to Dispute Wallace's Sexual Harassment Claims</u>

Whether or not the Court draws an adverse inference regarding Pruyn's silence, the Court must examine the Agency's failure to develop probative evidence to challenge Wallace's claims. As noted above, summary judgment is most appropriate after "an adequate time for discovery…" *See e.g.* <u>Celodex</u>, 477 U.S. at 322. In the present litigation, the parties engaged in extensive discovery, including taking eleven depositions collectively. The VA deposed Wallace and Morale, who gave credible and compelling testimony in support of Wallace's harassment claims. Plaintiff deposed a total of nine witnesses, including eight current or former employees of the VA. As far as the Plaintiff can tell, the VA has not developed evidence that undermines or casts significant doubt on Wallace's important factual claims.

**B.**    **Plaintiff Has Presented Substantial Evidence that Supports Partial Summary Judgment on Her Sexual Harassment Claims**

1.    <u>Plaintiff Has Presented Undisputed Facts that Support Every Element of a Hostile Work Environment Claim</u>

Title VII prohibits employment discrimination on account of sex.  42 U.S.C. 2000e et seq. *See also* 29 C.F.R. Part 1614 (federal sector EEO regulations).  Harassment arising from a hostile work environment requires a showing of five or six elements, depending on whether a supervisor is engaged in harassment.  A plaintiff must show:

> (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon race, color, or national origin; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) the conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive, and the victim in fact did perceive it to be so; and (6) a basis for employer liability has been established.

> <u>Kathuria v. Dental Dreams LLC</u>, U.S.D.C. MA (2018), 2020 U.S. Dist. LEXIS 119842 (*citing* <u>Prescott v. Higgins</u>, 538 F.3d 32, 42 (1st Cir. 2008); (*alteration in original*) (*quoting* <u>Thompson v. Coca-Cola Co.</u>, 522 F.3d 168, 180 (1st Cir. 2008); <u>Cuddyer v. Stop & Shop Supermarket Co.</u>, 434 Mass. 521, 532, 750 N.E.2d 928 (2001)).

Wallace has presented ample evidence to satisfy each of the above elements.  First, as a woman, Wallace is a member of a protected class.  Second, Wallace has described numerous examples of unwanted communications and unwelcome physical contact that was both harassing and harrowing.  Third, Pruyn's harassment was clearly connected to Wallace's gender.  Pruyn regularly commented and judged Wallace's appearance and dress.  Pruyn made regular comments that seemed calculated to foster a closer bond with Wallace, and he regularly hugged, kissed, and touched her in a manner that suggested he was acting on an attraction, infatuation, or love.  Fourth, the harassment was severe and pervasive enough to affect Wallace's comings and goings at work,

15

her availability to perform her job, and her relationships with coworkers and managers. Fifth, the contact was both objectively and subjectively offensive, Wallace described conduct by Pruyn that controlled her movements, kept her trapped in Pruyn's small office for hours each day, and made her both uncomfortable and frightened. A reasonable person in Wallace's position would be offended, and Wallace was clearly offended by Pruyn's words and deeds. Sixth, there is ample evidence to establish employer liability, but this issue will be more fully reviewed in the next section.

To the Plaintiff's knowledge, the Agency does not disagree with Wallace's analysis of the above factors. The Agency has not developed evidence that would challenge Wallace's claims about Pruyn's conduct or the deeply negative impact it had on her job and her life. As Pruyn has invoked the Fifth Amendment and declined to testify, the Court will not be hearing his perspective. For purposes of summary judgment, Plaintiff believes that her allegations of sexual harassment and a hostile work environment are undisputed.

### 2.      Plaintiff Has Proven that the VA is Liable for Pruyn's Conduct

Employers are vicariously liable for when their managers create a hostile work environment. When the hostile work environment is created by a supervisor, the employer is liable for it. Id. In Title VII cases, defendant can raise the "Faragher / Ellerth" defense if the employer "exercised reasonable care to prevent and correct promptly" the harassment, and (2) the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807-08, (1998)). However, this affirmative defense is not available when the supervisor's harassment results in a tangible employment action Faragher,

16

524 US at 778.  Tangible employment actions can include discharge, demotion, or undesirable reassignment.  Id.

Employers generally have little difficulty meeting the first prong of this defense, as most employers have sexual harassment prevention policies, which are published and/or presented through training.  The second prong of the defense is much harder to demonstrate, as it is defendant's burden to prove "an unreasonable failure" by the employee to use the complaint procedure.  Where an employee reasonably attempts to follow the harassment policy, a defendant cannot show an "unreasonable failure."  Moreover, to the extent the employee was harmed by an adverse action, a Faragher defense is not possible.

In the present case, the Agency must be held strictly liable for Pruyn's harassment of Wallace.  It is not disputed that the Agency has a harassment prevention policy and offers training, but having policies is not enough.  The Agency failed to exercise reasonable care where Muller admits that he "dropped the ball" when Wallace complained to him. .  In the FAD, the Agency faulted Muller for not processing Wallace's complaint, not informing management officials, and not referring Wallace to ORMDI.  FAD, Ex. E., pp. 2-3.  While the Agency is expected to argue that Wallace could have complained to other managers, Wallace provided credible testimony that she thought that Muller was her best option to receive a complaint:  "At the time, I thought Mr. Muller was the one that could help me."  Wallace Depo., p. 94. .  Wallace's decision to approach Muller was in keeping with the EEO Policy, which directed an employee to contact any appropriate manager, including the EEO Program manager.  See Ex. G, pp. 9-10.  In 2017, Muller held the title of EEO Program Manager.  On this record, the Agency would be hard pressed to show its own reasonable care in light of Muller's dereliction of duty.  The Agency also cannot show any unreasonable failure by Wallace, who complied with the EEO policy to the best of her understanding at the time.

17

**C.    Defendant Cannot Assert a Timeliness Defense that is Waived Once the Agency Makes a Finding of Discrimination and/or Timeliness**

Defendant is expected to argue that Wallace cannot prevail where her sexual harassment complaint was untimely filed.  Title VII of the Civil Rights Act of 1964 prohibits discrimination in federal employment on account of race, color, religion, sex, or national origin.  42 U.S.C. 2000e-16(a).  To assert a timely claim of discrimination, Federal employees must consult with an Equal Employment Opportunity (EEO) counselor "within 45 days of the date of the matter alleged to be discriminatory…"  29 C.F.R. 1614.105(a)(1).

Wallace complained to Muller in December 2017.  While her allegations of harassment began in June, 2017, they continued during her medical leave (July to September 2017), her return to NFS in October, 2018, and after Wallace left NFS (November and December 2017).  Wallace documented unwanted verbal contact and physical touching in October and November.  Plainly, Wallace's efforts to complain in or about mid-December 2017 would have been timely if Muller assisted her further or referred her to ORMDI.  Wallace's formal sexual harassment complaint was not filed until 2019, but the Agency concluded it was timely in light of Muller's ineffective assistance and guidance.

Federal agencies are empowered to adjust the 45-day deadline to initiate a complaint.  "The time limits in this part are subject to waiver, estoppel and equitable tolling."  29 C.F.R. 1614.604(c).  Agencies do not waive a defense of untimely filing by accepting and investigating a discrimination complaint.  *See e.g*. Bowden v. United States, 106 F.3d 433, 438 (D.C. Cir. 1997); Boyd v. United States Postal Serv., 752 F.2d 410, 414 (9th Cir. 1985); Belgrave v. Pena, 254 F.3d 384, 387 (2d Cir. 2001).

However, agencies do waive a timeliness defense when an investigation determines that a late-filed claim is timely.  See e.g. <u>Rowe v. Sullivan</u>, 967 F.2d 186, 191 (5th Cir. 1992) ("In order to waive a timeliness objection, the agency must make a specific finding that the claimant's submission was timely.").

Other circuit courts have taken a broader view of waiver than the Fifth Circuit, finding that an agency waives a timeliness defense when its investigation of a late-filed claims results in an administrative finding of discrimination.  The Ninth Circuit had ruled that "[t]he mere receipt and investigation of a complaint does not waive objection to a complainant's failure to comply with the original filing time limit when the later investigation does not result in an administrative finding of discrimination." <u>Boyd v. USPS</u>, 752 F.2d 410, 414 (1985).

In the present case, the VA has clearly waived any timeliness defense by ruling that Wallace's complaint was meritorious and timely.  The factfinder determined that Wallace endured "aggressive sexual harassment." <u>FAD</u>, p. 4.  Wallace was subjected to "unwanted verbal and physical conduct of a sexual nature, including being kissed and touched against her will." Moreover, the factfinder concluded that the conduct "was sufficiently severe and pervasive" to affect a term or condition of employment.  Wallace feared that she and Morale would lose their jobs, and Wallace felt compelled to transfer to another job to protect herself.

Even if this court were to apply the <u>Rowe</u> holding, the same result would be reached. Waiver is appropriate when an agency determines that a late-filed complaint is timely.  Here, it was determined that Wallace appropriately reached out to Muller, who failed to take proper action to assist her.  The FAD notes that Muller failed to open a complaint or report the matter to agency management.  The factfinder also agreed with ORMDI's initial finding that Wallace was never directed to contact ORMDI in 2017, and did not receive this guidance until 2019.  Based on this

19

record, the factfinder found "no cause to disturb ORMDI's decision regarding timeliness of the complaint." FAD, p. 3.

## III.    CONCLUSION

Wallace has provided substantial and uncontested evidence Pruyn sexually harassed her, Wallace was subjected to unwelcome verbal and physical conduct of a sexual nature, which offended her and would offend a reasonable person.  This conduct changed her work conditions, and it forced her to seek an immediate reassignment to a new role at the VA.  Pruyn has declined to testify on Fifth Amendment grounds, and the Court may draw an adverse inference that his silence bolsters or corroborates Wallace's account.   Where Pruyn was a supervisor, the Agency is strictly liable for his actions.  The Agency cannot avoid liability where it failed to act with reasonable care to help Wallace when its EEO Program Manager admits to dropping the ball and regretting his failure to inform management officials.  Wallace complied with the EEO policy in contacting Muller, and her failure to involve other managers does not constitute an unreasonable failure.  Finally, the Agency cannot assert a timeliness defense at this late date.  That defense was waived when the Agency's FAD determined that Wallace was sexually harassed and that she complained in a timely fashion.  Based on this record, Plaintiff should be entitled to summary judgment as to liability.  Plaintiff requests that damages be determined at a trial before jury as requested in his Complaint.

Respectfully submitted,
**PLAINTIFF KIMBERLY WALLACE**
By her attorney,

/s/ Paul W. Morenberg
Paul W. Morenberg, BBO # 631101
Law Office of Paul W. Morenberg
Ten Post Office Square, 8th Floor
Boston, MA 02109
Telephone: 617-630-2050
paul@morenberglaw.com

Dated: December 24, 2023

<b><u>CERTIFICATE OF SERVICE</u></b>

I, Paul W. Morenberg, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Paul W. Morenberg*

Paul W. Morenberg, BBO# 631101

Dated: December 24, 2023

21