# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KIMBERLY WALLACE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 22-10631-MJJ |
| ) | |
| DENIS MCDONOUGH, Secretary, U.S. ) | |
| Department of Veterans Affairs, ) | |
| ) | |
| Defendant. ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

March 26, 2025

JOUN, D.J.

Plaintiff Kimberly Wallace ("Ms. Wallace" or "Plaintiff") was sexually harassed by her supervisor, John Pruyn ("Mr. Pruyn"), during her employment with the Nutrition and Food Services Department ("NFS") at the Department of Veterans Affairs (the "VA" or "Defendant"). Over the course of seven months, from June to December 2017, Ms. Wallace was subjected to pervasive harassment by Mr. Pruyn, including inappropriate touching and kissing, private meetings in his office before and after shifts, and a disturbing poem addressed to Ms. Wallace as "Kimmy my beautiful butterfly." [*See* Doc. No. 44 at 11]. Mr. Pruyn's repeated harassment against Ms. Wallace caused her fear and made her feel "trapped" at NFS, creating an intolerable environment. As a result, Ms. Wallace resigned from NFS, started a position as a Time and Leave Clerk at the VA in October 2017, and forfeited her opportunity to apply for the position of NFS Supervisor in 2018. [*See* Doc. No. 89 at 19:22, 36-38; Doc. No. 101 at ¶ 20].

On March 20, 2024, I granted summary judgment in favor of Ms. Wallace on her claims of discrimination and hostile work environment in violation of Title VII of the Civil Rights Act of 1964 and reserved the determination of emotional distress damages for trial before a jury. [Doc. No. 44 at 10-13]. Following a four-day trial, on April 19, 2024, the jury returned a verdict finding that Ms. Wallace proved by a preponderance of the evidence that she sustained harm as a proximate result of the discriminatory conduct and awarding her $100,000 in compensatory damages. [Doc. No. 82]. On June 18, 2024, I held a bench trial to consider Ms. Wallace's claim for equitable damages in the form of back pay. [Doc. No. 89].

At the bench trial, Defendant moved for judgment as a matter of law, arguing that Plaintiff could not obtain back pay because she was not constructively discharged and did not plead a claim for constructive discharge distinct from her underlying discrimination claim.[1] [*Id.* at 54-57]. In opposition, Plaintiff argued that, because there is a presumption of back pay under Title VII, she did not need to plead a separate claim for constructive discharge, or alternatively, that the facts already developed in the litigation amounted to implicit consent by Defendant to try a constructive discharge claim. [*Id.* at 57-58]. Following the bench trial, Plaintiff moved to amend her Complaint to conform to the evidence at trial to add a constructive discharge claim. [Doc. No. 93]. Defendant opposed. [Doc. No. 102].

## I.    MOTION TO AMEND

Plaintiff did not move to amend until over two years after the Complaint was filed, more than six months after the close of discovery, and nearly three months after the conclusion of the

---

[1] Constructive discharge "refers to harassment so severe and oppressive that staying on the job while seeking redress—the rule save in exceptional cases—is intolerable." *Gerald v. Univ. of Puerto Rico*, 707 F.3d 7, 25 (1st Cir. 2013) (citation omitted). "A successful constructive discharge claim requires working conditions so intolerable that a reasonable person would have felt compelled to resign." *Id.* (cleaned up). "The standard to meet is an objective one, it cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held." *Id.* (cleaned up).

jury trial. Plaintiff has not provided any justification for the delay, and "[t]his is not a case in which previously unknown or undisclosed facts were brought to light at a late stage of discovery or at trial." *Data Gen. Corp.*, 825 F. Supp. at 345.

Rule 15(b)(2) provides a mechanism for a plaintiff to amend their complaint to add a claim after trial:

> *For Issues Tried by Consent.* When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

Fed. R. Civ. P. 15(b)(2). The rule "allows an unpleaded claim to be considered when the parties' conduct demonstrates their express or implied consent to litigate the claim." *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 319 (1st Cir. 2012). Additionally, "while the court has the discretion to allow late amendments, it may do so only if the non-moving party will not suffer undue prejudice." *In re Fustolo*, 896 F.3d 76, 84 (1st Cir. 2018). Here, Defendant did not expressly consent to try a constructive discharge claim, so the relevant inquiry is whether Defendant's conduct gave rise to an implicit consent, and if so, whether Defendant will suffer undue prejudice if the claim were added now. I find that Defendant did not impliedly consent.

"A party can give implied consent to the litigation of an unpleaded claim in two ways: by treating a claim introduced outside the complaint as having been pleaded, either through [the party's] effective engagement of the claim or through his silent acquiescence; or by acquiescing during trial in the introduction of evidence which is relevant only to that issue." *Antilles Cement*, 670 F.3d at 319 (cleaned up). "One sign of implied consent is that issues not raised by the pleadings are presented and argued without proper objection by opposing counsel." *Conjugal P'ship of Jones v. Conjugal P'Ship of Pineda*, 22 F.3d 391, 400-01 (1st Cir. 1994) (cleaned up).

"Engagement or acquiescence to the litigation of an unpleaded claim may occur through a party's failure to object once it becomes clear that the asserted claim is being incorporated into the pleadings." *In re Fustolo*, 896 F.3d at 84.

Ms. Wallace argues that her constructive discharge claim was tried by consent because, firstly, Defendant did not object to evidence presented at the jury trial where "Ms. Wallace testified in great detail about the specifics of the harassment that she endured and how they impacted her physically and psychologically" and "about the intolerable work environment that led her to leave NFS," and secondly, Defendant did not object to evidence at the bench trial that Ms. Wallace's decision to leave the NFS was "involuntary" and "motivated by intolerable conditions." [Doc. No. 93 at 3]. Defendant counters that the evidence went to Ms. Wallace's claims for discrimination and hostile work environment, and therefore Defendant "had no reason to believe that Plaintiff was also seeking to use this evidence to prove a constructive discharge claim." [Doc. No. 101 at 2]. I agree with Defendant.

"[C]onstructive discharge is a claim distinct from the underlying discriminatory act." *Green v. Brennan*, 578 U.S. 547, 559 (2016). "The introduction of evidence directly relevant to a pleaded issue cannot be the basis for a founded claim that the opposing party should have realized that a new issue was infiltrating the case." *In re Fustolo*, 896 F.3d at 84 (cleaned up). It is "the defendant's inalienable right to know in advance the nature of the cause of action being asserted against him," so "it is not enough that an issue may be inferentially suggested by incidental evidence in the record; the record must demonstrate that the parties understood that the evidence was aimed at an unpleaded issue." *Id.* (cleaned up); *Monod v. Futura, Inc.*, 415 F.2d 1170, 1174 (10th Cir. 1969) (Rule 15(b) serves "to bring the pleadings in line with issues

4

actually tried and does not permit amendment to include collateral issues which may find incidental support in the record").

Plaintiff cannot in hindsight simply tack on a constructive discharge claim without fair notice to Defendant. *Scholz v. Goudreau*, 901 F.3d 37, 46 (1st Cir. 2018) ("Because these questions were relevant to issues already before the jury, we find that they did not provide [Defendant] adequate notice that [an unpleaded] claim was being litigated."); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 825 F. Supp. 340, 344 (D. Mass. 1993) ("when evidence admitted at trial is relevant to a pleaded issue, it cannot give rise to a claim" that the opposing party consented to try an unpleaded issue). Plaintiff's introduction of evidence regarding her discrimination and hostile work environment claims—which might also be relevant to her constructive discharge claim—is insufficient to put Defendant on notice that the parties were also trying a constructive discharge claim. Indeed, Plaintiff never mentioned or sought to introduce evidence relevant to a constructive discharge claim in her pleadings, during discovery, before trial, in the parties' pretrial memoranda, at the final pretrial conference, during trial, or in the proposed jury instructions or verdict form. [Doc. No. 101 at 1-2]. The first time that constructive discharge was raised in this case was by the *Defendant* during the bench trial. [Doc. No. 89 at 54:13-15]. Thus, Plaintiff's Motion to Amend is denied; however, as I explain below, I find that Plaintiff need not have separately pled a claim for constructive discharge in order to receive an award of backpay.

## II.   FINDINGS OF FACT

The Veterans Health Administration at the VA employs more than 100 Nutrition & Food Services professionals at the VA Boston Healthcare System, including about 60 employees at its campus in Brockton, Massachusetts. [Doc. No. 89 at 63:1-10]. The positions within NFS at the

Brockton campus include dieticians, cooks, Food Service Workers (Grades Two, Three, and Four), a Work Leader, and four Food Service Supervisors ("NFS Supervisor"). [*Id.* at 63:11-22]. In 2011, Ms. Wallace was hired to work as a Food Service Worker in the NFS at the Brockton Campus. [*Id.* at 6:22-24, 7:6-7]. In 2015, Ms. Wallace was promoted to NFS Work Leader. [*Id.* at 7:12-22]. As a Work Leader, MS. Wallace would "support the management and supervisors ... like a buffer between the employees and the supervisors." [*Id.* at 8:11-14]. She would "open and close" for the NFS, "delegate duties to the employees" and give feedback to the employees and to the supervisors on the "employees' work performances." [*Id.* at 8:12-20]. Ms. Wallace did not consider the Work Leader position to be a desk job. [*Id.* at 8:21-23]. As a Work Leader, Ms. Wallace "helped the line as far as delivering food, making food trays" and she would "jump in and help" the supervisors and employees when needed. [*Id.* at 9:4-7]. Ms. Wallace estimates that she would spend approximately four to six hours on her feet in a typical day as a Work Leader. [*Id.* at 9:8-11]. Ms. Wallace worked in the NFS with her then-romantic partner, Marty Morale. [*Id.* at 50:24-51:2].

In 2015 and 2016, Ms. Wallace received good feedback as a Work Leader, and her rating was "excellent" in her performance appraisals for critical functions including leadership, communication, and safety. [*Id.* at 9:17-24, 10:1-6]. Ms. Wallace received a "fully successful" rating in quality management, a non-critical function, and an overall performance rating of "excellent." [*Id.* at 11:11-21]. In 2015/2016, Ms. Wallace received a "Certificate of Commitment to the VA Core Values," which was signed by the Chief of the NFS, Susan Hartery. [*Id.* at 11:22-12:8]. Ms. Wallace also received an "I Care Certificate" for helping to fix the Computrition system, which is an application that is used in the NFS that "logs in dislikes and likes for the veterans" and "prints their tickets according to the dietician's diet." [*Id.* at 12:13-15, 14:10-12].

When the Computrition system went down, Ms. Wallace figured out that she "could get a hardwire connection to the computer to get the tickets printed so the veterans could get their meals for that day." [*Id.* at 14:3-6]. In the Spring of 2017, Ms. Wallace received a "VA Gold Coin" for "setting up a better way to deliver nourishments to the veterans while at the same time keeping the staff safe," which included reducing safety issues related to the carts that were used to deliver nutrition, as well as for creating a "program where the veterans would get more nourishments in the downtime." [*Id.* at 14:15-15:17]. For this achievement, Ms. Wallace was recognized by the Director of the Boston VA. [*Id.* at 15:23-16:2].

Ms. Wallace worked hard as a Work Leader for two years because she aspired to become an NFS Supervisor. [*Id.* at 16:10-12]. Former Work Leaders, such as Linda Chapman, have been able to become NFS Supervisors in the past. [*Id.* at 16:22-17:3]. Ms. Wallace initially anticipated that there would be an opening in late 2017 for an NFS Supervisor position because one of the Supervisors was retiring, although she later learned that this Supervisor did not retire until 2018. [*Id.* at 17:4-16]. In June 2017, Ms. Wallace went on medical leave for a knee surgery until October 2017. [Doc. No. 96 at 96-100]. After her knee surgery, Ms. Wallace decided that she could not return to the NFS due to "the sexual harassment, the touching, the kissing, the everything." [Doc. No. 89 at 17:17-13]. After the surgery, Ms. Wallace began searching for new jobs and found an opportunity as a Time and Leave Clerk for the Nursing Department at the VA. [*Id.* at 18:1-11]. In October 2017, Ms. Wallace was hired for the position of Time and Leave Clerk, but had to return to the NFS before starting her new position. [*Id.* at 18:15- 18]. When she returned to NFS, the sexual harassment continued, as it had before and during her medical leave. [*Id.* at 18:19-19:5].

When considering whether to remain in the NFS and seek out the Supervisor position, Ms. Wallace decided to leave the NFS because of the harassment she experienced, describing that she felt "trapped" and "frightened being in there." [*Id.* at 19:15-20:2]. Her decision to leave the NFS was involuntary. [*Id.* at 19:18-20]. Ms. Wallace had concerns regarding her job security at the NFS because Mr. Pruyn had threatened to put Ms. Wallace and her partner's employment in jeopardy. [*Id.* at 20:3-10].

On October 29, 2017, Ms. Wallace began her new role as a Time and Leave Clerk. [*Id.* at 20:13]. The transfer was technically considered a promotion because she would receive a $200 annual increase in her new role, although Ms. Wallace did not view it as a promotion. [*Id.* at 20:14-22]. At the time Ms. Wallace completed her service at the NFS and moved to her new role, her annual salary increased from approximately $43,242[2] to $43,414. [*Id.* at 21:7-15]. In the Time and Leave Department, there were opportunities for advancement in steps, but not in grade, and Ms. Wallace was not aware of any other supervisory openings or promotional opportunities. [*Id.* at 21:16-22:3]. Ms. Wallace received step changes approximately every two years as a Time and Leave Clerk. [*Id.* at 32:22-33:1].

On November 21, 2018, there were two openings for an NFS Supervisor position at the Brockton campus. [*Id.* at 23:13-24:9]. To apply for the role of NFS Supervisor, an individual would have to apply on the usajobs.gov website, pass an initial screening with human resources, be chosen from a pool of candidates by the NFS Supervisors, and complete an interview process, potentially competing against multiple other candidates. [*Id.* at 49:10-50:8]. The pay scale for this position at the time of the job posting was for a Grade WS-3 ("Work Supervisor"), with a

[2] Ms. Wallace was earning $20.72 an hour at that time. To calculate the annual salary of an NFS worker from the applicable wage tables, the hourly rate is multiplied by 2,087 hours. To convert an annual salary to an hourly rate, the annual salary is divided by 2,087 hours. [Doc. No. 89 at 90:3-8].

per-hour pay scale ranging between $24.76 to $28.85. [*Id.* at 29:17, 30:5]. The salary range represented the steps within that grade, meaning that $24.76 per hour represented the lowest step, at Step 1, and the $28.85 per hour represented the highest step. [*Id.* at 25:2-11]. It takes approximately six months to move from a Step 1 position to a Step 2 position, approximately 12 to 18 months to move from a Step 2 to a Step 3 position, and approximately two years to move from a Step 3 to a Step 4 position. [*Id.* at 28:2-12].[3] Had Ms. Wallace been hired as an NFS Supervisor in December 18, 2018, she would have been eligible for a Step 4 rate on or about December 2022. [*Id.* at 32:5-11]. The Supervisor and compensation rates in the NFS were higher than compensation rates as a Time and Leave Clerk in the Nursing Department. [*Id.* at 32:12-15].

Ms. Wallace was familiar with some of the job requirements for an NFS Supervisor because she shadowed Supervisors for the day shift and night shift. [*Id.* at 25:12-26:3]. Ms. Wallace believed that she had the right qualifications, experience, and training to meet the job requirements of an NFS Supervisor, and that there were no job requirements she lacked or any physical impairments that would prevent her from doing the job, which required a significant amount of standing. [*Id.* at 26:16-27:5]. Following her knee surgery and physical therapy, Ms. Wallace was cleared to return as a Work Leader and there were no limitations on her standing or lifting abilities. [*Id.* at 27:6-19]. The physical demands of a Work Leader are greater than that of a Work Supervisor. [*Id.* at 78:19-22]. Ms. Wallace did not have supervisory experience in any of her previous roles but had a somewhat of a supervisory role as a Work Leader when she acted as a buffer between workers and Supervisors. [*Id.* at 39:23-40:23, 43:13-15].

Despite believing that she could fulfill the role, Ms. Wallace did not apply because Mr. Pruyn would have been her supervisor, and she did not believe that it was a "safe environment ...

---

[3] This wage schedule changes and new schedules may be applicable at any given time. [*Id.* at 30:9-31:5].

to apply as a supervisor." [*Id.* at 36:19-37:3]. Ms. Wallace also believed that NFS was an unsafe environment because other supervisors did "nothing to help" her despite being aware of Mr. Pruyn's harassing conduct. [*Id.* at 37:5-14]. For this reason, even after Mr. Pruyn was fired in 2019, Ms. Wallace did not apply for any NFS Supervisor openings because "[e]verybody knew what was going on" and it "wasn't a safe environment for [Ms. Wallace] personally" or for her mental health and ongoing therapy. [*Id.* at 37:15-38:1]. In 2019, Ms. Wallace was being treated by a therapist for depression, anxiety, and post-traumatic stress disorder, and explained that she had difficulty going back to Building 20 where the NFS was located. [*Id.* at 38:2-39:2]. Ms. Wallace moved to Tennessee in 2021 where she continued to work as a Time and Leave Clerk. [*Id.* at 36:8-13].

Ultimately, the Supervisor position that was open in late 2018 was filled by Peter Markwell who had 30 years of supervisory experience in the military. [*Id.* at 48:12-13, 50:16-21, 76:20-22]. However, he was junior to Ms. Wallace at the NFS. [*Id.* at 22:24-23:4]. When Ms. Wallace was Work Leader, Mr. Markwell was a Food Service Worker. [*Id.* at 23:8-9]. He moved into the Work Leader position when Ms. Wallace left the NFS. [*Id.* at 22:14-15; 23:8-11]. The next vacancy was available in February 2019, which was filled by Dana Reyenger. [*Id.* at 66:14-19]. Ms. Reyenger did not previously work for the NFS and was hired over several other applicants. [*Id.* at 66:20-25]. The next vacancy after that, in March 2020, was filled by Carol Treeful, a previous Grade 4 Food Service Worker. [*Id.* at 67:1-11]. Then in early January or February of 2021, another vacancy was filled by Donald Anderson, a previous NFS Work Leader who had applied for two prior supervisory openings but was not hired until the third time he applied in 2021. [*Id.* at 67:12-25].

## III.  CONCLUSIONS OF LAW

### A.  <u>Availability of Back Pay</u>

The First Circuit has not determined whether a separate claim of constructive discharge is a precondition to receiving backpay under Title VII. Under current precedent, I find that pleading a separate claim of constructive discharge is not required to receive backpay under Title VII.

In February 2020, the District Court of Puerto Rico held that a "plaintiff must show either an actual or constructive discharge in order to receive the equitable remedy of reinstatement, or back and front pay in lieu of reinstatement." *Reyes Caparros v. Barr*, No. 15-cv-2229, 2020 WL 1487267, at *1 (D.P.R. Feb. 28, 2020) (cleaned up). There, the plaintiff was awarded compensatory damages for retaliation and hostile work environment claims under Title VII. *Id.* Reyes thereafter sought back pay because he resigned from his employment after the harassment he experienced. *Id.* The court held that Reyes's failure to plead a separate constructive discharge claim precluded him from that recovery as a matter of law. *Id.* The court further held that even if Reyes was entitled to recovery without pleading a constructive discharge claim, Reyes "did not carry his burden at trial of proving that his resignation constituted a constructive discharge." *Id.* at 5. There is "no decision from the First Circuit Court of Appeals in which a back pay or front pay award under Title VII (or related statutes) was allowed to stand absent either an actual discharge or a claim for constructive discharge." *Id.* at 6. On appeal, however, the First Circuit only considered whether Reyes "waived his objection to the district court's decision to submit the constructive discharge issue for an advisory verdict and whether the district court's decision to reject the advisory jury's verdict in Mr. Reyes's favor was clearly erroneous." *Reyes v. Garland*, 26 F.4th 516, 520 (1st Cir. 2022). The First Circuit expressly declined to decide whether Reyes needed to have pled a separate constructive discharge claim. *See id.* at n. 2.

I decline to adopt *Reyes*'s conclusion that failure to plead constructive discharge bars recovery of backpay under Title VII. While I agree that a "constructive discharge is a claim distinct from the underlying discriminatory act," *Green*, 578 U.S. at 559, *Green* does not stand for the proposition that failure to plead this distinct claim bars recovery or otherwise overrules the Supreme Court's decision in *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975). In *Albemarle*, the Court held that "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.* at 421. "It is necessary, therefore, that if a district court does decline to award backpay, it carefully articulate its reasons." *Id.* at n. 14. In reaching this decision, the Court considered the legislative purpose of Title VII. *Id.* at 416 ("A court must exercise this power 'in light of the large objectives of the Act'") (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944)).

Under Title VII, "[t]he statutory authority for making awards of backpay in Title VII cases is cast in language that emphasizes flexibility and discretion in fashioning an appropriate remedy," *Albemarle*, 422 U.S. at 447 (Blackmun, J. concurring):

> "If the court finds that the ***respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint***, the court may enjoin the respondent from engaging in such unlawful employment practice, and ***order such affirmative action as may be appropriate, which may include, but is not limited to***, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or ***any other equitable relief as the court deems appropriate***.

42 U.S.C. § 2000e-5(g)(1) (emphasis added). "The power to award backpay was bestowed by Congress, as part of a complex legislative design directed at a historic evil of national proportions." *Albemarle*, 422 U.S. at 416. Title VII is "intended to give the courts wide

12

discretion exercising their equitable powers to fashion the most complete relief possible." *Id.* at 421.

A few months after *Reyes*, following *Albemarle*, the District Court of Massachusetts held that there is a presumption in favor of awarding back pay once there has been a finding of unlawful discrimination under Title VII. *See Smith v. City of Bos.*, 460 F. Supp. 3d 51, 59 (D. Mass. 2020) (Young, D.J.). *Smith* involved a 2008 Boston lieutenants' exam that was found to have had a disparate impact on minority candidates. *Id.* at 54. The officers sought back pay under the theory that they lost the opportunity to be promoted had they been able to take an updated 2014 exam that was "qualitatively far superior to the 2008 exam." *Id.* In finding that a presumption of backpay exists under Title VII, the court declined to follow as dictum a footnote in *Lopez v. City of Lawrence, Mass.*, 823 F.3d 102, 121 n. 16 (1st Cir. 2016), that held that it was the *officers'* burden to show that, more likely than not, "he or she would have been promoted" had Boston used a less discriminatory tool. *Id.* at 56. Rather, the court reasoned, it is *Defendant's* burden to rebut the "*Albemarle* presumption" that "the Officers would have been promoted but for the unlawful exam and are therefore entitled to back pay." *Smith*, 460 F. Supp. 3d at 60. Declining to articulate whether the presumption must be rebutted by a preponderance of the evidence or some other standard, the court held that Boston failed to rebut the presumption "under any conceivable standard." *Id.* at 60; *see also Anderson v. Brennan*, 254 F. Supp. 3d 253, 260 (D. Mass. 2017), *aff'd,* 911 F.3d 1 (1st Cir. 2018), and *aff'd,* 911 F.3d 1 (1st Cir. 2018) ("The Court has equitable discretion in awarding back pay, but the First Circuit has also stated that back pay is a "presumptive entitlement" of a plaintiff who succeeds in a Title VII case").

I find that, like in *Smith*, the VA has not rebutted the presumption that Ms. Wallace "would have been promoted but for" the sexual harassment she experienced at the NFS. *Smith*,

460 F. Supp. 3d at 60; *see also id.* at 59 ("Under Title VII, the diminished <u>opportunity</u> for employment is a distinct and 'concrete injury,' even though it is 'speculative' how the ultimate employment hiring or firing decision will shake out") (emphasis in original). Defendant asks me to find that, regardless of the sexual harassment, Ms. Wallace would not likely have been promoted because (1) her romantic relationship was a conflict of interest, (2) she lacked supervisory experience, (3) she was limited in her ability to perform the physical demands of the job, and (4) she had nevertheless been searching for other jobs related to her computer engineering degree. None of these facts are sufficient to rebut the presumption that Ms. Wallace "suffered at least a diminished chance of employment as a result of the discriminatory" conduct and is thus "entitled to make-whole relief for the value of that job insecurity as a standalone injury." *Id.* at 59.

First, while a romantic relationship "would definitely be a factor" that the NFS "would strongly consider because it would be viewed as a conflict of interest," [Doc. No. 89 at 73:22-74:8], there is no policy that states that an individual cannot be hired as a Supervisor if they are in a relationship with someone in that department who would be a subordinate. [*Id.* at 79:12-16]. Nancy Lavoie, Chief of the NFS, testified that there are four Supervisors in the Brockton, MA campus, and that "there would certainly be opportunities where the supervisor assigned to do your performance appraisals is not the supervisor working that day that you're there working," [*id.* at 76:1-13], thereby limiting the conflict.

Second, Ms. Lavoie testified that an applicant with more supervisory experience over another applicant did not necessarily "have a better chance of being hired into the supervisor position." [*Id.* at 73:4-8]. Supervisory experience is only a "preferred" qualification for the job, among others which include the "ability to have difficult conversations, the ability to coach and

counsel employees, hold them accountable, follow policies and procedures and apply them daily through practice, and certainly a sense of responsibility and an ability to solve problems." [*Id.* at 70:2-7]. Given Ms. Wallace's excellent performance appraisals across multiple critical functions, including leadership, her experience as a buffer between the supervisors and employees, her experience shadowing NFS Supervisors, and the recognition she received for her dedication to the VA, Ms. Wallace's limited supervisory experience does not necessarily mean she could not have been chosen over other candidates with more experience.

Third, Ms. Wallace's previous issues with her knees would not have prevented her from fulfilling the NFS Supervisor position. Ms. Wallace was cleared to return to work as a Work Leader, [*id.* at 27:6-19], which had greater physical demands than that of a Work Supervisor. [*Id.* at 78:19-22]. Lastly, that Ms. Wallace may have been casually searching for other jobs during her time at the NFS does not mean that she would not have applied for and received the position of an NFS Supervisor—a position that Ms. Wallace testified she wanted and "worked very hard as a Work Lead for two years" to achieve. [*Id.* at 44:13-19, 16:10-12].

I find Ms. Wallace's testimony to be credible. Had Ms. Wallace remained in the NFS, she was capable of being promoted to NFS Supervisor. I further credit her testimony that she felt she had no choice but to leave the NFS, that she could not return to the NFS even after Mr. Pruyn was terminated given her belief that she was unsafe in that environment and that management would not help her, and that even entering the building where she previously worked was a trigger for her. Because Defendant has not rebutted the presumption that Ms. Wallace is entitled to back pay for her lost opportunity, I find that an award of back pay here is appropriate.

**B. The Back Pay Award**

"The purpose of damages under Title VII is to make the plaintiff whole." *Sinai v. New England Tel. & Tel. Co.*, 3 F.3d 471, 476 (1st Cir. 1993). The "remedial scheme in Title VII," which includes back pay, is "intended to compensate a plaintiff for the effects of the discrimination, both past and future, and to bring the plaintiff to the position which s/he would have occupied but for the illegal act(s)." *Selgas v. Am. Airlines, Inc.*, 104 F.3d 9, 12 (1st Cir. 1997). "Courts have wide discretion in exercising equitable powers in order to fashion the 'most complete relief possible' for a Title VII plaintiff." *Smith*, 460 F. Supp. 3d at 63 (citing *Albemarle*, 422 U.S. at 421); *Selgas*, 104 F.3d at 13 ("Trial courts have discretion to fashion the awards in Title VII cases so as to fully compensate a plaintiff in a manner that suits the specific facts of the case"). Plaintiff does not seek backpay for the 2019 calendar year because she earned overtime as a Time and Leave Clerk in 2019. [Doc. No. 101, at 7 n. 3]. I therefore exercise my discretion to award 4.5 years of backpay, from January 1, 2020 through June 30, 2024, totaling $69,524. *See Anderson*, 254 F. Supp. 3d at 260; [*see* Doc. No. 101 at ¶¶ 35-40]. Had Ms. Wallace been promoted to NFS Supervisor, I find the following:

1. In 2020, Ms. Wallace would have been an SF3, Step 2, with an hourly rate of $26.63. [Doc. No. 101 at ¶ 35]. $26.63 multiplied by 2,087 hours is $55,577 (rounding up). In 2020, she earned $44,696 as a Time and Leave Clerk. [*Id.*]. Subtracting Ms. Wallace's wages as a Time and Leave Clerk from the wages she would have earned as an NFS Supervisor in 2020, her backpay award for that year is $10,881.

2. In 2021, Ms. Wallace would have been an SF3, Step 2, through June 2021, with an adjustment to Step 3 in or about July 2021, with an hourly rate of $26.90 for the first half of the year and $27.97 for the second half of the year. [Doc. No. 101 at ¶ 36]. $26.90 multiplied

16

by 1,043.5 hours is $28,070 (rounding down) and $27.97 multiplied by 1,043.5 hours is $29,187 (rounding up), totaling $57,257. In 2021, Ms. Wallace earned $44,614 as a Time and Leave Clerk. [*Id.*]. Subtracting her wages as a Time and Leave Clerk from the wages she would have earned as an NFS Supervisor in 2021, her backpay award for that year is $12,643.

3. In 2022, Ms. Wallace would have been an SF3, Step 3, with an hourly rate of $28.81. [Doc. No. 101 at ¶ 37]. $28.81 multiplied by 2,087 hours is $60,126 (rounding down). In 2022, Ms. Wallace earned $44,960 as a Time and Leave Clerk. [*Id.*]. Subtracting her wages as a Time and Leave Clerk from the wages she would have earned as an NFS Supervisor in 2022, her backpay award for that year is $15,166.

4. In 2023, Ms. Wallace would have been an SF3, Step 3, with an hourly rate of $32.01. [Doc. No. 101 at ¶ 38]. $32.01 multiplied by 2,087 hours is $66,805 (rounding up). In 2023, Ms. Wallace earned $47,483 as a Time and Leave Clerk. [*Id.*]. Subtracting her wages as a Time and Leave Clerk from the wages she would have earned as an NFS Supervisor in 2023, her backpay award for that year is $19,322.

5. From January to June 2024, Ms. Wallace would have been an SF3, Step 4, with an hourly rate of $35.05, with a total salary of $36,575 for January to June 2024. [Doc. No. 101 at ¶ 39]. Her earned salary as a Time and Leave Clerk during that time was approximately $25,063. [*Id.*]. Subtracting Ms. Wallace's wages as a Time and Leave Clerk from the wages she would have earned as an NFS Supervisor for January to June of 2024, her backpay award is $11,512.

In total, from January 1, 2020 to June 30, 2024, Ms. Wallace is entitled to a back pay award of $69,524.

I further exercise my discretion to award prejudgment interest on the back-pay award. "The decision to award prejudgment interest in a Title VII case is within the discretion of the district court." *Equal Emp. Opportunity Comm'n v. Aviation Port Servs., LLC,* No. cv 18-10909, 2020 WL 1550564, at *5 (D. Mass. Apr. 1, 2020). Here, seven years have passed since Ms. Wallace was forced to leave NFS, forfeiting her opportunities for promotion and advancement. I find that "prejudgment interest is an appropriate remedy to make [Ms. Wallace] whole and protect [her] back-pay award from decrease in value caused by delay." *Id.* "Like the decision to award prejudgment interest, the determination of the appropriate *rate* of prejudgment interest lies within the discretion of the district court." *Id.* "Because Title VII-like some other federal statutes-is silent with respect to interest rates, the court has discretion to select an appropriate rate, and may look to outside sources, including state law, for guidance." *Orr v. Mukasey*, 631 F. Supp. 2d 138, 157 n. 5 (D.P.R. 2009) (cleaned up). "Courts typically look to either the federal (post) judgment rate contained in 28 U.S.C. § 1961, or to state law interest rates for an appropriate rate." *Id.* Plaintiff seeks prejudgment interest but does not seek a specific rate. In the absence of a parallel state claim, i.e., M.G.L. c. 151B, it would not be appropriate to award prejudgment interest at the 12% rate under M.G.L c. 231, § 6B. Instead, I find the 4.09% rate under 28 U.S.C.A. § 1961 to be more appropriate.[4] The Clerk shall calculate the prejudgment interest at this rate per annum starting from the commencement of the suit.

SO ORDERED.

/s/ Myong J. Joun
United States District Judge

---

[4] *See* 28 U.S.C.A. § 1961 ("[A] rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding"). These rates are published here: Federal Reserve Board - H.15 - Selected Interest Rates (Daily) - March 21, 2025.